## GRACEY'S APPEAL.

In a proper case the Court will make an allowance to a guardian for
past support and education of his ward.

The fact that the ward gave birth to an illegitimate child is not conclu-
sive evidence of the guardian's neglect.

Appeal from the Orphans' Court of Fulton County.   No.
395 January Term, 1882.

The facts of the case appear in the opinion of the Court,
sustaining exceptions to the report of an auditor, who was
appointed to restate the account of Andrew Fisher, guardian
of Mary E. Ensley, which opinion was as follows, per

ROWE, P. J. :

Mary Ensley was born in May, 1861.   Her father died, a
prisoner of war, in 1864, leaving a small tract of land worth
$1,000.   His widow married again.   In 1867 Andrew Fisher
was appointed guardian of Mary.   She was then with her
mother, who was in very poor circumstances, and had a child
or children by her second husband, and Mary was nurse or
help in the house.   Mr. Fisher took her away to his home
and kept her there a year before sending her to the Soldiers'
Orphans' School.   She was then but seven years of age.

From September, 1869, when she was eight years old, to
September, 1875, when she was fourteen years old, she was in
the Soldiers' Orphans' School, at Andersonburg.   She might
have remained there a year and eight months longer, and
been taught and boarded free, with necessary clothing provided
also.   The school was a good one and well conducted, and the

health of the pupils good. But in the fall of 1875 Mary Ensley was complaining, and had sore eyes—was unwilling to go back to school, and was fretting. She was no longer contented at school, and, in the opinion of her guardian, did not learn rapidly. He pitied her, and did not want her to go back against her will, and considered it useless to compel her. His view was that she could go to school from his own house, and would be contented and learn there. All this is very clearly seen in the testimony of H. H. Woodal, George Fields and Lewis Shaw.

He did not, however, keep her at home, but sent her to school, first to M'Connellsburg and afterwards to the Normal School at Shippensburg.

Being now between sixteen and seventeen years of age, he allowed her to go to Mt. Union to learn the trade of a milliner. He placed her there with his daughter, Mrs. Woolet, whose husband was the proprietor of a hotel. Mrs. Woolet was a proper person to have charge of her, but the hotel being on the line of the Pennsylvania railroad, and much frequented by commercial and other travellers, it had special dangers for a young girl of the ward's age. She seems to have remained here about a year and a half, and whilst here, at 17 years of age, she became pregnant. The guardian took her home to his house until the time came when she should be delivered, when he sent her to her grandfather, with whom and her mother she has since resided.

This is an outline of the facts, and I shall now state the rules of law applicable to the case.

It is to be observed that the guardian is dead, and the account is filed by his representatives. We cannot now know all the reasons and grounds which governed the guardian in his conduct towards his ward, and I feel bound to make every fair intendment in his favor. He ought to be presumed to have done his duty, to have acted honestly, except where the evidence shows otherwise, and especially ought he be supposed to have acted with honesty and a regard for his ward's interest, when he had no motive to do otherwise. So long as any act or expenditure was not for his own advantage, there is a

presumption in his favor, that, in his judgment, it was, on the whole, for the ward's benefit. There is no doubt that he has paid out every dollar that he claims credit for. But it is thought some of these expenditures were unwarranted.

Thus, the auditor thinks, the ward at seven years of age should have been sent away to school; that whilst at the school she ought to have received nothing whatever from her guardian for the little necessaries of girlhood, though (unlike many others of her schoolmates) she had the expectation of a small fortune at her attaining her majority; that she ought, though a girl of eight to fourteen, to have travelled most of way home from school and back again by herself, or, at least, without the care of her guardian; that because the guardian, in the view of the auditor, committed an error of judgment in withdrawing his ward from the Soldiers' Orphans' School, where she was maintained and educated at the expense of the State, he ought not to be allowed anything whatever for her maintainance and education from the time she left Anderson-burg till she arrived at sixteen years of age; that because, in the view of the auditor, he committed an error of judgment in sending her to Mt. Union, to learn the millinery business, instead of hiring her out to earn her clothes and board, he should not be allowed for her support during that time.

I do not agree with the auditor at all. It is clear to my mind that he has attributed to the guardian the loss of the ward's virtue. He could not have dealt with him more harshly if her guardian had himself deflowered the girl or had designed her ruin. As in most other cases, so in this. She lost her virtue by reason of her own want of principle. The evidence by no means warrants the assertion that he was indifferent to her welfare or regardless of her interests. The solitary fact to support such a contention is that he placed her in a hotel at Mt. Union, beyond his immediate care, and without full employment. But he put her there in charge of his own daughter, a proper person, to learn a trade, which was a proper purpose, and he is not alive to give us the other reasons which may have influenced him. The great majority of girls so placed would not be ruined, and she was as safe as the children of the guardian's own daughter. I think it was

an error of judgment on the guardian's part, but nothing more.

Nor do I at all agree that this girl, after leaving school, should have been hired out to service, to earn her board and clothes. She was worth about $2,000. There was no necessity to increase her fortune by her manual labor. It was the guardian's duty to cultivate her mind and manners and give her the best start and position he could. He did not foresee that she would render all he had tried to do for her nugatory, by becoming a mother out of wedlock. We must judge his actions by putting ourselves in his place at that time, not from our present standpoint. It is easy to be wise after the event.

What is a guardian's responsibility? Of course he is liable in case of willful abuse or gross negligence. He is chargeable with lack of fidelity where there is a want of ordinary care of the estate or person of the ward. As to the person, a want of ordinary care in respect of the body and health, as well as of the mind, manners and morals. I see no want of such ordinary care in this case. With respect to expenditures for support and education, if the guardian would be safe, he should avail himself of the Act of 29th March, 1832, Sec. 13, P. L. 193, and have the Court direct a suitable periodical allowance. But that is not absolutely necessary, for it is well settled that chancery will allow for *past* maintenance; Harland's Account, 5 Rawle, 323, 331. The rule is that the Court will allow credit for payments necessary and made in good faith, though without authority, if it be shown that the circumstances were such, that if application had been made to the Court, such authority would have been granted; Sharpe's Estate, 2 Phila. R., 280; Pettitt's Appeal, 3 Wright, 324; Stephen Smith's Appeal, 6 Casey, 397. What I have to consider is, whether under the circumstances as they appeared at the time of the expenditures, I would have authorized them.

It will be seen in the account which I have stated to accompany this opinion, that whilst I deem it a matter proper for the guardian himself to determine whether he would withdraw his ward from the Soldiers' Orphan School at fourteen years of age, yet, if he did so, it would have been right to have adhered

to his original intention of keeping her at home and letting her go to school from his house, and that the Court would not have sanctioned her going to the Normal School, which was, for one like her, no better than the one which she left.

In accordance with the principles above expressed, I have restated the account, which will show my opinion in detail. I need only add that I have not surcharged the guardian in respect of the $32.00 paid for fees, &c., in obtaining the ward's pension. It is true $25.00 only is allowed to the claim agent, but there is much trouble and expense incident to procuring the proofs in the country, which may be properly allowed.

I have allowed the guardian commissions at nine per cent. of the fund. He was guardian for fourteen years ; he procured the pension and attended to it quarterly. He seems to have had the sole oversight of Mary, whose mother never looked after her at all, nor visited her, even in her misfortune. My own opinion is that guardians are often not adequately paid. The compensation of an administrator, who settles up an estate and is done with it, is not enough for him who for many years has care and responsibility, without thanks.

The guardian, it will be seen, supported and educated the ward out of the accumulations without encroaching on the principal. The principal sum which came to his hands was $2,268.51. From this is to be deducted (a) the claim of Mrs. C. Ensley, the widow, $210.00 ; (b) commissions of guardian, $297.00 ; in all, $507.00—leaving $1,761.51. Now the balance in the guardian's hands, as ascertained by me, is $1,925.92, showing that there was no encroachment on the principal for the disbursements on account of the ward.

The exceptions are sustained, the report of the auditor is set aside, and the account is now restated as hereto attached. The balance in the hands of the said guardian, Andrew Fisher, is now declared and decreed to be $1,925.92. And it is further ordered that the costs (See Hughes' Appeal, 3 P. F. S., 500, 504) be paid out of the funds in the hands of the guardian.

Thomas Gracey, who had since been appointed guardian of Mary E. Ensley, then appealed from this decision.

*Messrs. W. B. Skinner, J. N. Sipes, Stenger & McKnight,* for appellant, cited McElhenny's Appeal, 46 Pa., 349.

*J. McD. Sharpe, Esq., contra,* cited Shollenberger's Appeal, 21 Pa., 343 ; Smith's Appeal, 30 Pa., 397; Pettit's Appeal, 39 Pa., 324 ; Konigmacher, vs. Kimmel, 1 P. & W., 207 ; Eyster's Appeal, 16 Pa., 372 ; Huffer's Appeal, 2 Grant, 341.

The Supreme Court affirmed the decree of the Orphans' Court on October 2nd, 1882, in the following opinion,

PER CURIAM :

The decree in this case is affirmed upon the opinion of the learned Judge in the Court below.

> Decree affirmed and appeal dismissed at the costs of the appellant.